**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| RAYMOND TROXELL, | : | |
| | : | |
| Petitioner, | : | Civ. No. 21-11227 (RK) |
| | : | |
| v. | : | |
| | : | |
| WARDEN NEW JERSEY STATE | : | **OPINION** |
| PRISON, | : | |
| | : | |
| Respondent. | : | |

**KIRSCH, District Judge**

## I.    INTRODUCTION

Petitioner, Raymond Troxell ("Petitioner" or "Troxell"), is a state prisoner currently incarcerated at New Jersey State Prison in Trenton, New Jersey.  He is serving a life sentence for murder.  Petitioner is proceeding through counsel with a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  For the following reasons, Petitioner's habeas petition is denied and a certificate of appealability shall not issue.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

The factual background giving rise to Petitioner's murder conviction is from the New Jersey Superior Court, Appellate Division on Petitioner's direct appeal as follows:

> [i]n summer 2008, defendant and Russo opened an Italian deli, Mezzaluna, in North Brunswick. Paul Scala, who owned a bakery next door, was instrumental in introducing the two men to each other.  Russo, who lived on Staten Island, was "like a brother to [Scala]," and defendant was his "good friend[ ]."  Soon after the business opened, however, defendant began complaining to Scala that, despite the fledgling business's financial problems, Russo was compensating himself and not contributing to the workload.
>
> The complaints worsened as the months passed, and, on one occasion, defendant told Scala that "if he (Russo) takes another . . .

dime[,] my friend . . . will go in there and shoot him in the back of the store in the head." On another occasion, defendant told Scala he had some "crazy friend . . . from Edison" who would "do the job." On a third occasion, defendant told Scala, "I'll kill that mother f- - - - - -, I got a guy for [$]3000 [who] is going to shoot him[.]" Scala told Russo, who brushed off the threats, saying Scala was "paranoid" and defendant "talk[ed] too much."

Other witnesses called by the State testified to the animosity between defendant and Russo over the operation of the business. Mezzaluna's cook, Anthony Agostino, identified notes left by defendant for Russo, threatening legal action and complaining about Russo talking money from the business.

At approximately 6:30 a.m. on December 16, 2008, North Brunswick Township police officer Robert Frangella was dispatched to Mezzaluna. All the doors were locked, but Frangella noted a Jeep with New York license plates parked in the rear. Shortly thereafter, Agostino arrived and opened the front door. Frangella found Russo's lifeless body near the back office door, on its knees and slumped over a box. It was "ice cold" and exhibited "lividity." No spent bullet casings were found at the scene, and a bottle containing Oxycontin was found on a table near the body.

It was estimated that Russo had been dead for approximately twelve hours. Although not initially clear what caused Russo's death, the medical examiner determined at autopsy that Russo died from a single gunshot wound to the head fired from a distance of four to six inches. The medical examiner opined it was most likely that Russo was shot while sitting in the chair in his office. Russo may have survived the shooting for a short period of time, during which he would still have had limited movement.

John Kissel testified that defendant was "one of [his] best friends," the two having both grown up together in Edison. They both knew co-defendant Marsh, who was also from Edison. Kissel owned Alpha Cab Company (Alpha Cab), and both defendant and Marsh worked at Alpha Cab at the time of the murder. Defendant complained about Russo and offered Kissel $3000 to kill Russo; Kissel refused. Kissel testified that defendant talked about killing Russo in Marsh's presence, but Kissel did not know whether the two discussed the issue outside his presence.

Kissel testified that on December 15, 2008, at approximately 7:00 p.m., Marsh came to his office at Alpha Cab. Following a brief conversation, the substance of which was not admitted before the

jury, Kissel went to Mezzaluna and saw Russo's Jeep parked in the back. Kissel called defendant and met him in the parking lot of a Walmart in North Brunswick. Kissel "told [defendant] that [Russo] was dead." Defendant was "[s]tunned a little bit." Kissel and defendant then went to defendant's house, and, at some point, Kissel saw defendant "holding a wad" of cash. Marsh arrived at defendant's house and stayed "[m]aybe [fifteen] minutes" before leaving. Kissel did not see defendant give the money to Marsh.

Kissel and defendant went to a bar around 11:00 p.m., and Marsh arrived a short time later. Angela Cusamano, a barmaid, testified that the three men were there, and videotapes from surveillance cameras at the bar corroborated the meeting. Cell phone records also revealed that defendant and Marsh spoke to each other numerous times on December 15. Defendant also called Marsh shortly after leaving the bar, at approximately 12:47 a.m. on December 16. Marsh called defendant later that afternoon, but, the call went directly to defendant's voice mail. At the time, defendant was being interviewed by investigators. Within thirty minutes of completing the interview, cell phone records revealed that defendant called Marsh and spoke to him for several minutes.

Bill Unger, a dispatcher and driver at Alpha Cab, saw defendant and Marsh speaking together outside the cab company on the afternoon of December 15. Unger, a gun enthusiast, testified that Marsh previously had shown him a "two-shot derringer" he owned. Marsh showed Unger the "very large" ".357" bullets that the derringer used and left one in the cab company's office "as a souvenir. . . ." Subsequent testimony by the State's ballistics expert revealed that this caliber bullet was consistent with the projectile fragments recovered from Russo's body at autopsy. The bullet that produced the fragments could have been fired from a derringer.

Charles Chicarella, a friend of Marsh, testified that he was trying to obtain some Oxycontin on December 15, 2008, but Marsh claimed he had none. However, late in the evening, at around 10:00 p.m., Marsh arrived at Chicarella's house and gave him two pills. Chicarella testified the pills looked the same as those in the bottle found by Russo's body.

Defendant was interviewed by Investigator Paul Miller of the Middlesex County Prosecutor's office on December 16, 2008. A formal statement was videotaped and played for the jury. Miller interviewed defendant again on December 18, 2008, after having interviewed Kissel and other witnesses. Defendant acknowledged saying months earlier that he "wish[ed] [Russo] wasn't around."

But, defendant claimed he did not know Marsh would actually take him seriously and kill Russo. When Marsh came to his house to be paid, defendant gave Kissel $3000 and told him to give it to Marsh out of fear. The second statement was videotaped and played for the jury.

Marsh lived in Macungie, Pennsylvania. On December 19, Miller and other law enforcement officers executed a search warrant at Marsh's home and seized various firearms and ammunition. Also found was an empty American Derringer "gun box."

While in the Middlesex County Correctional Center awaiting trial, defendant approached David Stankovits, a fellow inmate, and asked him "to testify on [defendant's] behalf." Stankovits told the jury that defendant asked him to tell police that, on December 15, while Stankovits was selling drugs near Scala's bakery, he saw a large man exit a car and enter Mezzaluna through the rear door. In exchange for this testimony, defendant promised Stankovits $1000 and "goodies in jail."

*State v. Troxell*, 85 A.3d 408, 410–12 (N.J. Sup. Ct. App. Div. 2014) (footnote omitted).

A jury convicted Petitioner of murder. He received a life sentence. Petitioner raised numerous claims on direct appeal. The New Jersey Superior Court, Appellate Division affirmed the judgment and conviction. *See id.* at 420. The New Jersey Supreme Court denied Petitioner's request for certification without discussion. *See State v. Troxell*, 112 A.3d 591 (N.J. 2014).

Petitioner then filed a post-conviction relief ("PCR") petition in state court. Ultimately, the New Jersey Superior Court denied all of Petitioner's PCR claims after conducting an evidentiary hearing on one ineffective assistance of counsel claim. *See* ECF No. 10-18 & 10-20. The New Jersey Superior Court, Appellate Division affirmed. *See State v. Troxell*, No. A-3126-17T3, 2020 WL 995104 (N.J. Sup. Ct. App. Div. Mar. 2, 2020). The New Jersey Supreme Court denied certification without discussion. *See State v. Troxell*, 230 A.3d 979 (N.J. 2020).

Petitioner then filed this habeas petition. Petitioner raises three claims in his petition. They are as follows:

4

1. Ineffective assistance of counsel by failing to impeach Kissel's testimony with cell phone records ("Claim I");

2. The State failed to correct Kissel's testimony despite being aware he was testifying falsely ("Claim II"); and

3. The State improperly suppressed a spreadsheet containing cell phone information until it was too late for it to be used by Petitioner's trial counsel to effectively cross-examine Kissel ("Claim III").

Respondent filed a response in opposition to Petitioner's habeas petition along with corresponding exhibits. *See* ECF Nos. 9, 10 & 11. Petitioner then filed a reply brief in support of his habeas petition. *See* ECF No. 13.

### III.    LEGAL STANDARD

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws or treaties of the United States. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also Mason v. Myers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (Apr. 24, 1996), applies. *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citations omitted). A federal habeas court making an unreasonable application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *See Williams v. Taylor*, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. Furthermore, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e); *see also Rice v. Collins*, 546 U.S. 333, 339 (2006) (petitioner bears the burden of rebutting presumption by clear and convincing evidence); *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001) (factual determinations of state trial and appellate courts are presumed to be correct). In determining whether a state court decision was based on an unreasonable determination of the facts:

> federal court review considers only whether the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The statute directs the federal court to *presume* that all determinations of fact made by the state court are correct and requires that the petitioner present "clear and convincing evidence" to rebut this presumption.

*Hunterson v. DiSabato*, 308 F.3d 236, 245–46 (3d Cir. 2002) (citing 28 U.S.C. § 2254(e)(1); *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 368 (3d Cir. 2002)). AEDPA's standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court

rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008). Furthermore, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 584 U.S. 122, 125 (2018); *Rambo v. Adm'r East Jersey State Prison*, 762 F. App'x 105, 107 (3d Cir. 2019) (noting the applicability of *Ylst*'s "look through" doctrine). These deferential standards apply "even where there has been a summary denial" by the state court. *See Cullen*, 563 U.S. at 187.

## IV.    DISCUSSION

### A.  Claim I

In Claim I, Petitioner asserts that trial counsel was ineffective when he failed to cross-examine Kissel with Marsh's cell phone records. Petitioner raised this claim during his PCR proceedings. The New Jersey Superior Court held an evidentiary hearing on this claim. Petitioner's trial counsel, Robert H. Corbin, Esq., testified at that hearing. The New Jersey Superior Court issued a written decision after the evidentiary hearing denying this claim stating as follows:

> The test for ineffective assistance of counsel was formulated in Strickland v. Washington, 466 U.S. 668 (1984) and adopted by our Supreme Court in State v. Fritz, 105 N.J. 42 (1987). To establish a deprivation of the Sixth Amendment right to the effective assistance of counsel, a defendant must satisfy the following two-pronged Strickland/Fritz test: (1) that counsel's performance was deficient, and he or she made errors that were so serious that counsel was not functioning effectively as guaranteed by the Sixth Amendment to

the United States Constitution; and (2) that there exists a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, <u>supra</u>, 466 <u>U.S.</u> at 694. The prejudice allegedly suffered by a defendant must result from counsel's performance in order to obtain post-conviction relief. A defendant must overcome the strong presumption that counsel rendered reasonable professional assistance. <u>State v. Parker</u>, 212 <u>N.J.</u> 269, 279 (2012). If a defendant establishes one prong of the test, but not the other, the petition for post-conviction relief must fail. <u>Id.</u> at 280. Thus, both prongs of the <u>Strickland</u>/<u>Fritz</u> test must be satisfied before post-conviction relief may be granted. <u>Strickland</u>, <u>supra</u>, 466 <u>U.S.</u> at 687.

Effective representation is not synonymous with errorless representation. An attorney may give advice that through the prism of hindsight was debatable or even erroneous. For any error by counsel to be constitutionally significant, it must undermine the fundamental fairness of the proceeding. <u>Strickland</u>, <u>supra</u>, 466 <u>U.S.</u> at 693. The competency standard enunciated in <u>Strickland</u> is both broad and flexible. <u>Id.</u> It is intended to encompass varied factual scenarios and circumstances. The proper test is whether counsel's advice was within the range of competence required of attorneys in criminal cases. While attorneys are expected to fulfill their duty of competent representation, a conviction should not be overturned unless there was a material breach of that duty. To the extent, if any, trial counsel's performance was deficient, that deficiency must directly result in prejudice to the defendant. Absent prejudice, there is not a reasonable probability of a different result sufficient to undermine confidence in the outcome. <u>State v. Arthur</u>, 184 <u>N.J.</u> 307, 319 (2005) (<u>quoting</u> <u>Strickland</u>, <u>supra</u>, 466 <u>U.S.</u> at 693).

When petitioning for post-conviction relief, the defendant must establish by a preponderance of the credible evidence that he or she is entitled to the requested relief. <u>State v. Preciose</u>, 129 <u>N.J.</u> 451, 459 (1992). To sustain that burden, the defendant must allege and articulate facts which "provide the court with an adequate basis on which to rest its decision." <u>State v. Mitchell</u>, 126 <u>N.J.</u> 565, 579 (1992). We apply the <u>Strickland</u> standard and review the reasonableness of counsel's assistance with "a heavy measure of deference to counsel's judgments." <u>State v. Martini</u>, 160 <u>N.J.</u> 248, 266 (1999) (<u>quoting</u> <u>Strickland</u>, <u>supra</u>, 466 <u>U.S.</u> at 691).

At the evidentiary hearing, PCR counsel questioned Mr. Corbin as to his decision to not use the cell phone records in cross-examining Mr. Kissel. Mr. Corbin testified that he was aware of the cell phone records. He indicated that he did not retain an expert to review the

cellphone records because it was not necessary.  He testified that when Mr. Kissel testified at trial, he was "all over the board."  Mr. Kissel indicated that his memory deficiency was due to injuries sustained while he was a wrestler.  Mr. Corbin explained that Mr. Kissel had a hard time remembering details and got times mixed up.  Mr. Corbin testified that he deliberately chose not to cross-examine Mr. Kissel on the phone regards because Mr. Corbin did not want to give Mr. Kissel a chance to rehabilitate his testimony.  The timeline of the evening was very important to the defense.  Mr. Corbin felt that the receipt from Home Depot and surveillance footage from the pub served as strong evidence for the defense as to the timeline.  Accordingly, Mr. Corbin deliberately chose not to cross-examine Mr. Kissel on the phone records because he did not want to give Mr. Kissel an opportunity to rehabilitate himself.

Mr. Corbin testified that the defense was that Mr. Troxell at some time mentioned that he wanted to pay someone to kill Mr. Russo but that he did not mean it and did not think anyone took it seriously.  Mr. Corbin was well aware of the phone records and even used the records in summation to argue that Mr. Kissel was not credible.  Mr. Corbin testified that the choice to use the phone records in summation rather than in cross-examination was so Mr. Kissel would not have the opportunity to explain the inconsistencies in his testimony.  The court finds Mr. Corbin's testimony to be credible because of Mr. Corbin's demeanor and forthrightness.

Mr. Corbin's choice to use the cellphone records during summation rather than during cross-examination was a deliberate, strategic choice.  A reviewing court must not second-guess reasonable, strategic decisions of trial counsel, even with the benefit of hindsight.  Kimmelman v. Morrison, 477 U.S. 365, 382 (1986).  The correct inquiry is instead whether "counsel [made] a thorough investigation of the law and facts and consider[ed] all likely options."  State v. Chew, 179 N.J. 186, 217 (2004) (quoting Strickland, supra, 466 U.S. at 690-91).  If counsel did so, "counsel's trial strategy is virtually unchallengeable."  Id.  Here, Mr. Corbin was well aware of the existence of cellphone records and even used them during summation to discredit Mr. Kissel's testimony.  The fact that Mr. Troxell now believes that he should have used the records during cross-examination as well does not warrant post-conviction relief.

ECF No. 10-20 at 2-5.  The New Jersey Superior Court, Appellate Division on appeal affirmed the

New Jersey Superior Court's decision on this claim as follows:

To establish an [ineffective assistance of counsel] claim, a defendant must satisfy the two-prong test formulated in Strickland v. Washington, 466 U.S. 668, 687 (1984), and adopted by our Supreme Court in State v. Fritz, 105 N.J. 42, 58 (1987).  First, he must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment."  Id. at 52 (quoting Strickland, 466 U.S. at 687).  Second, a defendant must show by a "reasonable probability" that the deficient performance affected the outcome.  Fritz, 105 N.J. at 58.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  State v. Pierre, 223 N.J. 560, 583 (2015) (quoting Strickland, 466 U.S. at 694; Fritz, 105 N.J. at 52).

Importantly, "[o]ur standard of review is necessarily deferential to a PCR court's factual findings . . . that are supported by sufficient credible evidence in the record."  State v. Nash, 212 N.J. 518, 540 (2013) (citing State v. Harris, 181 N.J. 391, 415 (2004)).  We review de novo, however, the trial court's application of those facts to the legal principles involved.  Harris, 181 N.J. at 416.

In assessing defendant's claim, we "give great deference to counsel's performance and must strongly presume that the attorney's conduct constituted reasonable professional assistance[,]"  State v. Petrozelli, 351 N.J. Super. 14, 21–22 (App. Div. 2002), remaining wary in order to "avoid viewing the performance under the 'distorting effects of hindsight.'"  State v. Norman, 151 N.J. 5, 37 (1997) (quoting Strickland, 466 U.S. at 689).  "The quality of counsel's performance cannot be fairly assessed by focusing on a handful of issues while ignoring the totality of counsel's performance in the context of the State's evidence of [a] defendant's guilt."  State v. Castagna, 187 N.J. 293, 314 (2006) (citing State v. Marshall, 123 N.J. 1, 165 (1991)).

In this case, the PCR judge had the opportunity to hear and see trial counsel's testimony, which he judged credible.  He accepted counsel's explanation why he did not confront Kissel with the phone records during cross-examination, choosing, instead, to deliver a blow to Kissel's credibility on summation, when the witness would be unable to explain away inconsistencies.

Moreover, as trial counsel explained, the divergence between Kissel's timeline and contrary implications from the phone records was not critical to the overall defense strategy.  After all, in his statement to police, defendant admitted offering money to Marsh to kill Russo, but he claimed the offer was in jest and he never thought

Marsh would go through with the murder. Defendant admitted giving money to Kissel to give to Marsh but claimed he did so out of fear after finding out Marsh actually had killed Russo.

Kissel's testimony about seeing Marsh at defendant's home and what transpired on the evening of the murder was undoubtedly important. However, trial counsel was able to establish through the State's investigator that Marsh's phone was using certain cell towers at various times, and that it was unlikely Marsh could have been at defendant's home when Kissel claimed he was. Trial counsel drove the point home in summation. The tactic was effective, because, in summation, the prosecutor acknowledged that defendant's version of the timing of the evening's events made "more sense" than Kissel's based on the location information in Marsh's phone records. The prosecutor nonetheless urged the jury to believe Kissel's version based on other evidence in the record.

Generally, "strategic miscalculations or trial mistakes are insufficient to warrant reversal 'except in those rare instances where they are of such magnitude as to thwart the fundamental guarantee of [a] fair trial.'" Castagna, 187 N.J. at 315 (alteration in original) (quoting State v. Buonadonna, 122 N.J. 22, 42 (1991)). Counsel's "strategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" Strickland, 466 U.S. at 690. We reject defendant's claim that trial counsel rendered deficient performance because he failed to cross-examine Kissel with the cell phone records.

*Troxell*, 2020 WL 995104, at *2–3.

In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court articulated a two-prong test for demonstrating when a petitioner is entitled to federal habeas relief on an ineffective assistance of counsel claim. First, a petitioner must show that considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.* at 688; *see also Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (noting that it is necessary to analyze an ineffectiveness claim considering all of the circumstances) (citation omitted). A petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. *See Strickland*, 466 U.S. at 690. Under the first prong of *Strickland*, scrutiny of

counsel's conduct must be "highly deferential." *See id.* at 689. Indeed, "[c]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If counsel makes "a thorough investigation of law and facts" about his plausible options, the strategic choices he makes accordingly are "virtually unchallengeable." *Gov't of Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1432 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91). If, on the other hand, counsel pursues a certain strategy after a less than complete investigation, his choices are considered reasonable "to the extent that reasonable professional judgments support the limitations on investigation." *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91).

The second prong of *Strickland* requires a petitioner to affirmatively show prejudice. *See* 466 U.S at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*; *see also McBridge v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 102 n.11 (3d Cir. 2012). "This does not require that counsel's actions more likely than not altered the outcome, but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011) (internal quotation marks and citations omitted).

"With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.'" *Rainey v. Varner*, 603 F.3d 189, 201 (3d Cir. 2010) (quoting *Strickland*, 466 U.S. at 697).

When assessing an ineffective assistance of counsel claim in the federal habeas context, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Grant*, 709 F.3d at 232 (quoting *Harrington*, 562 U.S. at 101). "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself." *Id.* (internal quotation marks and citation omitted). Federal habeas review of ineffective assistance of counsel claims is thus "doubly deferential." *Id.* (quoting *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011)). Federal habeas courts must "take a highly deferential look at counsel's performance" under *Strickland*, "through the deferential lens of § 2254(d)." *Id.* (internal quotation marks and citations omitted).

The Court has reviewed the relevant transcripts from Petitioner's trial and PCR proceedings. As indicated by the state courts, Petitioner's trial counsel made a strategic decision to not use the cell phone records to impeach Kissel's testimony during cross-examination. Instead, Mr. Corbin testified during the PCR proceedings that while he could have asked Kissel about the cell phone records, he thought that the records spoke for themselves and, because Kissel was "all over the board," answering questions in unexpected ways, Mr. Corbin did not want to ask Kissel a question for which Mr. Corbin did not know how Kissel would answer. *See* ECF 10-19 at 31.

On federal habeas review, the review is "doubly deferential" given that a federal habeas court analyzes whether the state courts acted contrary to, or unreasonably in their application of *Strickland* and its progeny.  *See Nguyen v. Att'y Gen. of New Jersey*, 832 F.3d 455, 457 (3d Cir. 2016) (citing *Knowles v. Mizayance*, 556 U.S. 111, 123 (2009)).  Mr. Corbin explained the reasons for wanting to hold back the cell phone evidence until summation as he did not know how Kissel would answer his questions.  Instead, Mr. Corbin testified he used the cell phone records to challenge Kissel's credibility during summation.  *See* ECF No. 10-19 at 45.  The state courts found Mr. Corbin's testimony to be credible.  Indeed, even the prosecutor during his summation had to respond to the cell phone records discussed by Mr. Corbin in his earlier summation and how they could potentially hurt the prosecution's case from a timing perspective.  The prosecutor stated as follows during summation:

> Now, the fact that all three men spent over an hour at this North Brunswick Pub is most telling for many reasons.  First of all, J.C. tells us that Frank [Marsh] arrived at the Troxell home at around nine o'clock or between nine and 10 after the Monday night football game started and got paid by Ray [Troxell].  J.C. [Kissel] doesn't see it exactly 100 percent cash from one hand to another but he saw Ray [Troxell] with a wad of money go into another room where Frank [Marsh] was.  And if you can make from the records, either the dispatch records, the Alpha dispatch records, or the CDW records with cell phones and cell towers which is not an exact science, if you can – if you can sort out where Frank [Marsh] might otherwise have been, then Troxell's story about the payment taking place after the North Brunswick Pub meeting would make more sense.

ECF No. 9-18 at 50-51.  Nevertheless, the Court's notes that the prosecutor then continued his summation by arguing that the money transaction between Petitioner and Marsh occurred prior to the meeting at the North Brunswick Pub.  *See id.* at 51-52.

The holding by the state courts that Mr. Corbin's decision on when best to use the cell phone records to challenge Kissel's credibility was not contrary to, nor an unreasonable application

of *Strickland* and its progeny, nor was denying this claim based on an unreasonable determination of the facts.  The Superior Court conducted an evidentiary hearing on this claim.  The Court heard Mr. Corbin testify directly as to his decision-making, and found Mr. Corbin's testimony credible as to his thought process on this point.  In his reply brief, Petitioner argues that trial counsel could not have made a strategic decision to not use the cell phone records while cross-examining Kissel because he did not have the cell phone spreadsheets.  As explained in *supra* Part IV.C, Petitioner is not entitled to federal habeas relief on the failure of the prosecution to produce the spreadsheets before Kissel's testimony because Petitioner had the underlying factual data of the cell phone calls as Mr. Corbin testified to during the PCR evidentiary hearing.  *See* ECF No. 10-19 at 43.  The possession or lack of possession of the spreadsheets is irrelevant and not dispositive as, more importantly, Mr. Corbin credibly testified he had the underlying data and made a sound, reasoned strategic decision regarding the timing of its use.

Additionally, it is worth reiterating that the New Jersey Superior Court conducted an evidentiary hearing on this claim and had the ability to view Mr. Corbin's demeanor and forthrightness and found him a credible witness.  Petitioner fails to show that this factual finding was wrong based on clear and convincing evidence as is required by AEDPA.  Petitioner's counsel had the underlying cell phone records at his disposal to allow him to make a strategic decision on when best to use them.

For these reasons, Petitioner fails to show that he is entitled to relief on Claim I such that it will be denied.[1]

---

[1] Claim I in the habeas petition relates to an assertion that counsel was ineffective for failing to use cell phone records to impeach Kissel's testimony.  In his reply brief, Petitioner raises a new ineffective assistance of counsel claim.  Most notably, Petitioner, through counsel, now also argues that trial counsel was ineffective for failing to present evidence rebutting the State's theory that Petitioner withdrew funds from the business to have his partner killed.  *See* ECF No. 13 at 6-9. However, a petitioner cannot raise claims for the first time in a reply brief. *See Judge v. United*

B.  Claim II

In Claim II, Petitioner argues that the State was aware that Kissel testified falsely but failed to correct his testimony.  Petitioner asserts that this claim "is made in reference to Kissel's testimony relating to his witnessing Petitioner's alleged payoff to Marsh at Petitioner's residence at 9:00 p.m. on December 15, 2008[,] and the State's position that it was always its position, at trial, that the payoff occurred later." ECF No. 1-1 at 20.  The New Jersey Superior Court, Appellate Division denied this claim first noting that it had not been raised before the New Jersey Superior Court.  Nevertheless, it further denied the claim on the merits noting as follows:

> inconsistencies between the phone records and Kissel's testimony were laid bare for the jury, and the prosecutor acknowledged those inconsistencies.  Kissel himself testified that he generally was "not that sure about the times," and admitted that he had memory problems that affected his recall. There is no evidence that the prosecutor solicited false testimony.

*Troxell*, 2020 WL 995104, at *4.

A habeas claim based on prosecutorial misconduct should be granted only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks and citation omitted); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  A prosecutorial misconduct claim is examined in "light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).  Likewise, a "reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the

---

*States*, 119 F. Supp. 3d 270, 284 (D.N.J. 2015); *McNeil v. Johnson*, No. 18-10003, 2019 WL 3805118, at *1 (D.N.J. Aug. 12, 2013) (collecting cases and noting the impropriety of raising a habeas claim for the first time in a reply brief).

conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).

The prosecution's knowing use of perjured testimony violates the Fourteenth Amendment. *See Giglio v. United States*, 405 U.S. 150, 153 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "A witness commits perjury if he or she 'gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *United States v. Hoffecker*, 530 F.3d 137, 183 (3d Cir. 2008) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)).  A habeas petitioner must "show that (1) [the witness] committed perjury; (2) the government knew or should have known of his perjury; (3) the testimony went uncorrected; and (4) there is any reasonable likelihood that the false testimony could have affected the verdict." *Lambert v. Blackwell*, 387 F.3d 210, 242 (3d Cir. 2004).

Petitioner is not entitled to federal habeas relief on this claim.  The Court has reviewed the entirety of Kissel's testimony.  During direct examination, Kissel testified that Marsh and Petitioner met up with him at Petitioner's home around 9:00 p.m. as Kissel was there watching football and professional wrestling.  *See* ECF No. 9-11 at 92.  However, later during direct examination, Kissel testified that he was "not that sure about the times." *See id.* at 93.  During cross-examination, Kissel testified that he participated in professional wrestling whereby he got hit in the head often and now sometimes forgets things. *See id.* at 105.  Furthermore, during cross-examination, Kissel testified that he did not remember whether the professional wrestling and football on the television had just started when Marsh arrived, but he did indicate that both programs started at 9:00 p.m. *See id.* at 112.

During Petitioner's trial counsel's summation, he vociferously argued as follows to the jury with respect to Kissel's testimony about an approximate 9:00 p.m. meetup at Petitioner's house between Marsh and Petitioner:

> Now, what does J.C. Kissel say? I go over to Ray Troxell's house, I sit there – and I believe he indicates almost as soon as he gets there who shows up but it's Frank Marsh. I believe he says time is around 9:15. Frank Marsh shows up. He sees Ray Troxell with he described a wad of money in his testimony. He says he doesn't see any transfer of monies, but he saw Ray Troxell with the money and Frank Marsh leaves.
>
> Look at the phone records of Frank Marsh during that time period. Frank Marsh is nowhere, nowhere near South Brunswick and Ray Troxell's house. He is not there. He's in Edison. He's in Piscataway. And we produced Bonnie Reed, even though the Prosecutor's Office had talked to her, and she puts Frank Marsh in Metuchen at her place of work somewhere between 7:30 and eight o'clock. I believe she may have said 7:30 on the stand. Prosecutor cross examined her, well, didn't you say before it was between 7:30 and eight o'clock? Yes, I did. Well, that's an inconsistency. It's an inconsistency, whether or not it's material.
>
> If you determine whether there's an inconsistency in statements, whether a prior statement – excuse me – a prior statement, one given on the stand, you make that determination in your own mind whether that inconsistency is to a material fact which would affect you in making your determination in this case.
>
> And you also see a call from Bonnie Reed to Frank Marsh at around 7:58. But those calls, the other calls, will demonstrate the approximate locations of Frank Marsh, and again no indication of any of the calls he's in the South Brunswick area because I suggest to you he was not.
>
> Frank Marsh didn't meet up with J.C. Kissel and Ray Troxell until somewhere after 11.

*See* ECF No. 9-18 at 17-18. During the prosecutor's summation, he asserted that Kissel stated that Marsh arrived at Petitioner's home between 9:00 and 10:00 p.m. *See id.* at 50. It is at around this time that the prosecutor's summation surmised that the money transfer from Petitioner to Marsh

occurred, not at the North Brunswick Pub later in the evening when the three men met up again. *See id.* at 52. However, as noted in *supra* Part IV.A, the prosecutor also had to acknowledge the problem the cell phone records posed with respect to this timeline. *See* ECF No. 9-18 at 50-51. Furthermore, during Petitioner's PCR proceedings, the State essentially admitted that Kissel's testimony was inconsistent with the phone records regarding the possible 9:00 p.m. time for the meeting at Petitioner's house between him and Marsh. *See* ECF No. 10-19 at 10-11.

As the New Jersey Superior Court, Appellate Division noted, the inconsistencies in Kissel's timing testimony were presented to the jury. The Court fails to see how Kissel's inconsistent testimony amounts to perjury when he himself testified he was not sure on the "timing." Indeed, it was the prosecutor's questioning during direct examination which elicited from Kissel that he was not sure of the "timing." There is also no indication that the State knew or should have known that Kissel was committing perjury, particularly as Kissel himself admitted at trial that he was not sure on the "timing." *See, e.g.*, *United States v. Gordon*, 657 F. App'x 773, 779-80 (10th Cir. 0216) (stating inconsistencies in witness testimony does not alone constitute perjury and fails to show that the prosecution knew the testimony was false."); *United States v. Waters*, No. 12-319, 2012 WL 12985623, at *11 (E.D. Pa. July 17, 2012) ("Inasmuch as mere inconsistencies between witness testimony and other evidence available to the parties establishes neither that any witness gave false testimony concerning a material matter with the willful intent to provide false testimony nor that the Government knew or should have known of [the witness's perjury, we may reject [the] suggestion that the Government committed a due process violation by presenting such testimony at trial[.]") (internal quotation marks and citation omitted). Petitioner's trial counsel attempted to exploit the inconsistencies in Kissel's statements during summation to

the jury which presumably could have undermined Kissel's credibility to the jury.   This presumably caused the prosecution the need to respond during its summation

No prosecutorial misconduct has been shown based on this record.  For these reasons, Claim II is denied.[2]

C.  Claim III

In Claim III, Petitioner argues that the State suppressed a spreadsheet containing cell phone information until it was too late for Petitioner's trial counsel to effectively cross-examine Kissel. The New Jersey Superior Court, Appellate Division analyzed this claim as follows during Petitioner's PCR proceedings:

> [i]n Point II, defendant argues the State committed a *Brady* violation because before trial it did not provide underlying phone subscriber information contained on spreadsheets that the State's investigator prepared for presentation during his testimony.  The issue was never raised before the PCR judge, nor was it raised on direct appeal. See R. 3:22-4(a) (barring claims that could have been raised on direct appeal but were not).  Nonetheless, the trial record is clear.  Defense counsel had all the information, albeit not organized in the same format as the spreadsheets the investigator prepared for his testimony.  Following counsel's objection, the trial judge ordered the State to provide copies of the spreadsheets before permitting the State to use the exhibits at trial. The argument merits no further discussion. R. 2:11-3(e)(2).

*Troxell*, 2020 WL 995104, at *4.

Claim III is brought pursuant to *Brady v. Maryland*, 373 U.S. 83 (1973).  A due process violation under *Brady* "occurs if: (1) the evidence at issue is favorable to the accused, because either it is exculpatory or impeaching; (2) the prosecution withheld it; and (3) the defendant was prejudiced because the evidence was 'material.'" *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir.

---

[2] Respondent argues that this claim is unexhausted because Petitioner did not raise this claim before the PCR Court.  Even assuming, without deciding that this claim is unexhausted, the Court would still deny this claim on the merits as an unexhausted claim because it is not "colorable." *See Carpenter v. Vaughn*, 296 F.3d 138, 146 (3d Cir. 2002) (citations omitted).

2011) (citations omitted).  Materiality requires "a reasonable probability that, if the evidence had been disclosed, the result of the proceeding would have been different." *Id.* (citing *Giglio v. United States* 405 U.S. 150, 152 (1972)).  "'[T]he materiality standard for *Brady* claims is met when 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.''"  *United States v. Johnson*, 628 F. App'x 124, 129 (3d Cir. 2015) (quoting *Banks v. Dretke*, 540 U.S. 668, 698 (2004) (quoting *v. Whitley*, 514 U.S. 419, 435 (1995))).  The United States Supreme Court has stated the following:

> [T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.  But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, *see Brady*, 373 U.S. at 87 . . . the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

*Kyles v. Whitley*, 514 U.S. 419, 437-48 (1995).  As noted by the Third Circuit:

> "[t]he materiality of *Brady* depends almost entirely on the value of the evidence relative to the other evidence mustered by the state." *Rocha v. Thaler*, 619 F.3d 387, 396 (5th Cir. 2010) (internal quotation marks and citation omitted).  Suppressed evidence that would be cumulative of other evidence or would be used to impeach testimony of a witness whose account is strongly corroborated is generally not considered material for *Brady* purposes. *Id.* at 396-97. Conversely, however, undisclosed evidence that would seriously undermine the testimony of a key witness may be considered material when it relates to an essential issue or the testimony lacks strong corroboration.

*Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013).

Petitioner's trial counsel essentially admitted during the PCR proceedings that he had the relevant cell phone records in his possession prior to cross-examining Kissel.  Indeed, during cross-examination in the PCR proceedings, the following discussion took place between the prosecutor and Mr. Corbin:

> Q:  Please take a look at that and tell me if you recognize it.
> A:  And I believe this is the – these are the phone records of Frank Marsh's phone –
> Q:  And were those –
> A:  -- Verizon, mmm-hmm.
> Q:  -- were those admitted at trial by Investigator Paul Miller?
> A:  Yes.
> Q:  And that, what you're looking at, isn't the actual phone records; it's a summary chart, is that fair to say?
> A:  This is – I think this is the actual phone records.
> Q:  Okay.
> A:  It's not a summary where you pick out certain ones.
> Q:  Okay.
> A:  This is, you know, all by times and by dates.
> Q:  All right, so now just back on – so you had that at the time of the cross examination of Mr. Kissel, correct?
> A:  I believe I did, yes.
> Q:  And you had enough time to review it, right?
> A:  I had time to review it, yeah.  I don't recall exactly when we got it, but I had reviewed it.
> Q:  Okay.  And did you choose to cross examine Mr. Kissel with those records.
> A:  No.
> Q:  Why not?
> A:  Because the records speak for themselves, okay?  And we also had – we already had the testimony of Mr. Kissel, if you want to call it that, that he couldn't tell what time it was.

ECF No. 10-19 at 42-43.

The New Jersey Superior Court, Appellate Division noted in its opinion recited above that Mr. Corbin had all the relevant information to impeach Kissel, albeit perhaps not in the same organized form the prosecutor's investigator prepared for his testimony.  Petitioner nonetheless argues that he should have been provided with the more organized spreadsheets of Marsh's cellphone records to impeach Kissel.

A relatively similar *Brady* issue was raised in *Dukes v. Pappas*, 405 F. App'x 666 (3d Cir. 2010).  In that case, the issue was whether the failure to disclose a spreadsheet constituted a *Brady*

violation.  In finding that there was no *Brady* violation, a panel of the Third Circuit stated as follows:

> [w]e also affirm the District Court's alternative holding that there was no *Brady* violation because the information Dukes claims the government withheld was known by and available to him.  "[T]he rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence *only known to the Government.*"  *United States v. Zackson,* 6 F.3d 911, 918 (2d Cir. 1993) (internal quotation marks omitted, emphasis added).  Therefore, "*Brady* does not compel the government to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself."  *United States v. Pelullo,* 399 F.3d 197, 213 (3d Cir. 2005) (internal quotation marks omitted).
>
> Dukes does not allege that he was unaware of or unable to obtain information concerning the financial transactions cataloged in the spreadsheet; to the contrary, as the District Court noted, in his criminal appeal he acknowledged that he had access to relevant bank records before trial.  *See United States v. Dukes,* 242 Fed. Appx. 37, 49 (4th Cir.2007); *see also United States v. Dixon,* 132 F.3d 192, 199 (5th Cir.1997) (no *Brady* violation when government seized defendants' financial records because defendants either knew or should have known about this information).  While Dukes may have found it more convenient to work from the government's spreadsheet than from the raw financial information that he either already had or could have acquired with reasonable diligence, *Brady* does not require the government "to facilitate the compilation of exculpatory material that, with some industry, defense counsel could marshal on their own."  *United States v. Runyan,* 290 F.3d 223, 246 (5th Cir.2002).

*Dukes v. Pappas*, 405 F. App'x 666, 669 (3d Cir. 2010).

Like *Dukes*, Marsh's cell phone records were available to Petitioner's trial counsel.  That a more organized spreadsheet may not necessarily have been disclosed to Petitioner's trial counsel until after Kissel testified does not constitute a *Brady* violation because Petitioner already had the data from Marsh's cellphone at his disposal prior to Kissel's testimony.

In his reply brief, Petitioner argues that the New Jersey Superior Court, Appellate Division decision ignores that that trial counsel admitted that he had no understanding of the phone records. However, during the PCR evidentiary hearing, Petitioner's trial counsel stated that he did not think a phone expert was necessary for two reasons: (1) he had the phone records, and (2) it was Petitioner's admission that a transfer of money occurred—not *when* the transfer occurred—that mattered. *See* ECF No. 10-19 at 48.

Accordingly, Claim III is denied.[3]

## V.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254.  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Applying this standard, the Court finds that a certificate of appealability shall not issue in this case.

---

[3] Like Claim II, Respondent argues that this claim is unexhausted because Petitioner did not raise this claim before the PCR Court.  However, even applying the more deferential "colorable" standard to an unexhausted claim rather than applying AEDPA deference, *see Carpenter*, 296 F.3d at 146 (citations omitted), Claim III would still be denied.

## VI. CONCLUSION

For the foregoing reasons, Petitioner's habeas petition is denied. A certificate of appealability shall not issue. An appropriate order will be entered.

DATED: May 31, 2024

_____
ROBERT KIRSCH
United States District Judge